Joesph A. Brooks
1137 Meaderboro Road
Farmington, NH 03835
(603) 923-2793
nh_cherokee@yahoo.com

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH A. BROOKS,<br><br>                Plaintiff,<br><br>vs.<br><br>STATE OF NEW YORK, NEW YORK STATE POLICE, STATE TROOPER TIMOTHY FINNEGAN, INVESTIGATORS TIMOTHY P. GOULD, & JAMES WOLLMAN, AND OTHER NEW YORK STATE POLICE EMPLOYEES, IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES<br><br>                Defendant | Case No.:<br><br><br>COMPLAINT |

## <u>PLAINTIFF'S COMPLAINT AGAINST DEFENDANTS</u>

1
COMPLAINT  -

# TABLE OF CONTENTS

**TABLE OF CONTENTS**...................................................................................................................**2**

**TABLE OF AUTHORITIES**...........................................................................................................**4**

**PRELIMINARY STATEMENT**.......................................................................................................**5**

**JURISDICTION AND VENUE**.......................................................................................................**6**

**PARTIES**............................................................................................................................................**7**

**FACTUAL ALLEGATIONS**...........................................................................................................**8**

**CAUSES OF ACTION**...................................................................................................................**18**

**COUNT I**...........................................................................................................................................**18**

**42 U.S.C. § 1983 – CONSTITUTIONAL TORT - FIRST AMENDMENT RETALIATION**

**DEFENDANTS FINNEGAN & WOLLMAN**................................................................................**18**

**COUNT II**.........................................................................................................................................**18**

COMPLAINT  -

**NEW YORK CODE § 670 – STATE CONSTITUTIONAL TORT - FIRST AMENDMENT RETALIATION AND DENIAL OF RIGHTS UNDER ARTICLE I, SECTION 7 OF THE NEW YORK CONSTITUTION AGAINST DEFENDANTS FINNEGAN & WOLLMAN**......................18

**COUNT III**...............................................................................................................................**19**

**42 U.S.C. § 1983 – CONSTITUTIONAL TORT - FALSE ARREST & STATE TORT – FALSE ARREST– DEFENDANTS FINNEGAN & WOLLMAN**................................................................**19**

**COUNT IV**..............................................................................................................................**20**

**NEW YORK CODE § 670 – STATE CONSTITUTIONAL TORT - FALSE ARREST – DEFENDANTS FINNEGAN & WOLLMAN**........................................................................**20**

**COUNT V**..............................................................................................................................**20**

**MONELL CLAIM – FAILURE TO TRAIN – DEFENDANT NEW YORK STATE POLICE**.......**20**

**COUNT VI**............................................................................................................................**35**

**MALICIOUS PROSECUTION CLAIM INDIVIDUAL DEFENDANTS** ……………………………………**35**

**COUNT VII**………………………………………………………………………………………………………….....**36**

**FAILURE TO INTERVENE CLAIM INDIVIDUAL DEFENDANTS**…………………………………......**36**

**COUNT VIII**……………………………………………………………………………………………………….....**37**

**DENIAL OF RIGHT TO FAIR TRIAL CLAIM INDIVIDUAL DEFENDANTS**…………………………**37**

**PRAYER FOR RELIEF**...........................................................................................................**37**

3
COMPLAINT  -

**JURY DEMAND**.................................................................................................................**38**

## TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page**

*Cohen v. California*, 403 U.S. 15 (1971)…………………………………………………………5
*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)…………………………5

**Federal Statutes**
28 U.S.C. §1331…………………………………………………………………………………6
28 U.S.C. §1343…………………………………………………………………………………6
28 U.S.C. §1367…………………………………………………………………………………6
28 U.S.C. §1391…………………………………………………………………………………6
28 U.S.C. §2201…………………………………………………………………………………6
28 U.S.C. §2202…………………………………………………………………………………6
42 U.S.C. §1983…………………………………………………………32,33,35,36
42 U.S.C. §1988…………………………………………………………………………………38

**State Statutes**
New York Code §120.5……………………………………………………………5,6,15,24
New York Code §205.30……………………………………………………………………24
New York Code §240.20……………………………………………………………………24
New York Code §485.05……………………………………………………………….....38
New York Code §670…………………………………………………………………...18,19

**Constitutional Amendments**
U.S. Const. Amend. I…………………………………………………...……5,6,32,33,34
U.S. Const. Amend. IV………………………………………………………...…...6,33
U.S. Const. Amend. XIV…………………………………………...…………………6,33,36

**State Constitutions**

New York State Constitution, Article I Section VII…………….…………...…………..6,32,33
New York State Constitution, Article I Section VIII…………………...…….…....…..6,32,33

Plaintiff, Joseph A. Brooks, proceeding *pro se*, respectfully submits this complaint against the named defendants, including those defendants whose identities may or may not be known at present.[1]

### PRELIMINARY STATEMENT

Criticism of the way law enforcement officials conduct their public duties is expressive activity given the highest levels of protection by the First Amendment to the U.S. Constitution. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). This conduct is essential to monitoring encounters between law enforcement and members of the public. No matter how unartfully phrased, such criticism is protected speech and cannot be suppressed or form the basis of retaliation by the leveling of, or the threat of, criminal charges. *Id.*, *Cohen v. California*, 403 U.S. 15 (1971).

In this instant case, the Plaintiff's criticism of the police officers' conduct satisfies the third prong of the *Mt. Happy* test: but for the Plaintiff's criticism, would the police have acted in the way they did? *Mt. Happy* at 287. The New York State Police, in response to Brooks's criticisms of their behavior, brutally beat the plaintiff to the point where plaintiff was bruised and bloodied. The First Amendment does not tolerate this retaliation and criminal punishment of civilians who criticize government officials.

---

[1] Plaintiff Brooks was given assistance by the New York Legal Assistance Group's SDNY Pro Se Clinic in drafting this complaint. Plaintiff Brooks was also assisted by his mother Wanda Duryea in drafting this complaint.

5
COMPLAINT  -

After exercising his First Amendment right to voice his criticism of Defendant Finnegan's conduct during a request for service and subsequent use of force, Plaintiff Brooks was charged with Assault of Police Officers a Second Degree Felony under New York Code Section 120.5. Defendant Finnegan, Wollman, and Gould's filing of criminal charges was expressly intended to retaliate against Mr. Brooks for exercising his constitutionally protected right to free speech. As such, Defendants violated Brooks's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 7 and 8 of the New York Constitution.

This civil rights action seeks declaratory relief, permanent injunctive relief, and damages.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this Complaint under the First, Fourth and Fourteenth Amendments to the United States Constitution and 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights) and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

2. The Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

3. Venue is proper in this District under 28 U.S.C. §1391 because Defendants are or were employed within the District, and the acts giving rise to this lawsuit occurred within the District.

## PARTIES

4.      Plaintiff Joseph Alan Brooks ("Brooks") is a citizen of the

United States and at all relevant times was a resident of

Farmington, Strafford County, New Hampshire.

5.      Defendant Trooper Finnegan ("Finnegan") was at all times

relevant to this Complaint a trooper with the New York State

Police. In his capacity as a trooper for New York State Police,

Defendant Finnegan had a legal obligation to act in conformity

with the United States and New York Constitutions and other

applicable federal and state laws. Defendant Finnegan is being

sued in his official and individual capacity. At all times relevant

to this Complaint was acting within the scope and course of his

employment with the New York State Police. At all times relevant

to this Complaint, he was acting under color of the laws of the

United States and the State of New York.

6.  Defendant Investigator Wollman ("Wollman") was at all times relevant to

this Complaint an Investigator with the New York State Police. In his

capacity as an Investigator for New York State Police, Defendant Wollman

had a legal obligation to act in conformity with the United States and New

York Constitutions and other applicable federal and state laws. Defendant

Wollman is being sued in his official and individual capacity. At all times

relevant to this Complaint was acting within the scope and course of his

7
COMPLAINT  -

employment with the New York State Police Department. At all times relevant to this Complaint, he was acting under color of the laws of the United States and the State of New York.

7.      Defendant State of New York ("NY") is a municipal corporation existing and operating pursuant to the laws of the State of New York. New York State is the public employer of the other Defendants in this matter and has a legal responsibility to operate according to the laws of the United States and the State of New York, including, but not limited to, the United States Constitution and the New York Constitution.

## FACTUAL ALLEGATIONS

8.      Joseph Alan Brooks ("Brooks") was born in Manchester, New Hampshire but has lived in Farmington, New Hampshire since 1998.

9.      Brooks is thirty-nine years old.

10.     Brooks resides in Farmington, New Hampshire with his mother, roommate, and his maternal cousin.

11.     Brooks is disabled due to PTSD.

12.     Prior to being disabled, Brooks had previously worked at antique vehicle restoration and then worked for an auto body shop in Hampton, NH until his PTSD no longer allowed him to continue

8
COMPLAINT  -

working.

13.     Brooks has always thought of himself as someone who
supports law enforcement and the difficult service they
perform.

14.     On or around July 14, 2019, Brooks, his mother Wanda Duryea,
and his maternal cousin, Cheyenne Harding, drove into South
Salem, New York in Westchester County to assist Seth Duryea,
Joseph's step-father to clean and move possessions out of
Brooks's deceased step-grandmother's home.

15.     After they arrived in South Salem, Brooks and his family slept
overnight at the Soth Salem, NY Home.

16.     July 15, 2019 When no one was available at the local Police
department they proceeded to the Somers barracks of the NY
State Police as they had done on previous occasions.

17.     At the Somers State Police Barracks, Brooks and Cheyenne
observed a NY State Trooper sign and copy Brooks's New
Hampshire parolee travel form.

18.     On or around July 26, 2019, Brooks, his mother Wanda Duryea,
and cousin Cheyenne Harding, drove to the New York State
Police Barracks in located in Somers, Westchester County, New
York to obtain a signature on a New Hampshire parolee travel

form confirming their departure from New York going home to New Hampshire.

19.   Brooks was familiar with the barracks procedure; when no one answered his knocking on the locked door, Brooks utilized the call box. Using the call box, Brooks spoke with a dispatcher who stated that they would send an officer to the Somers barracks.

20.   Following the call, Trooper Finnegan appeared at the barracks.

21.   After informing Trooper Finnegan of the reason for the call and Brooks asking for the required signature, Finnegan informed Brooks he would call his Sergeant for instructions.

22.   Brooks informed Finnegan that he would be in violation of the terms of his parole if he did not receive a police signature authorizing travel out of New York State. Brooks asked to speak with a supervisor or the shift sergeant.

23.   Finnegan got out of the vehicle then told Brooks that he would not be signing the form, that Brooks would need to go to White Plains to the county sex offender registration office.

24.   On the video recorded by Brooks, Brooks told Duryea that Finnegan also refused to put in writing that he would not sign. Brooks asked for his forms back to proceed with leaving New York State. Finnegan did not return the forms. Brooks had

10
COMPLAINT  -

started to film the interaction to prove to parole that he

attempted to follow the parolee travel procedure and sign out

at the same department that he had signed in at.

25.     Finnegan informed Brooks that his Sergeant recommended

that Brooks go to White Plains to get the needed signature.

26.     Finnegan looked into the police vehicle he had just exited . Upon

observation, Finnegan stated "My Sergeant said you have to go to

County. What is this, a Tier 3 [sex offense]?" (Brooks's victim

was 4 years old – yes it is a Tier 3 [sex offense] in 2002)

27.     Brooks, Duryea, and Cheyenne attempted to explain to Finnegan

that his Sergeant was misinformed; Brooks had been able to

successfully obtain signatures at the Somers Police Barracks and

other locations without incident.

28.     Joseph Brooks said, "I'm asking for the duty to sign a piece of

paper." Trooper Finnegan replied,"What's, what's the other

piece of paper. We need to see that, too. Joseph Brooks

responded,"You have them all in your hand, where'd you

leave 'em all." Trooper Finnegan said,"Well, there's another

piece of paper?" Finnegan moved over to the cruiser and

looked through the window. Brooks said, "You took it Sir."

29.     At this time, Trooper Finnegan marched up to Brooks and

elbowed Brooks in the chest. Trooper Finnegan then said, "Get out of my way."

30.    After being struck, Brooks saw another officer, Officer Wollman exit the police barracks to accept a delivery.

31.    At this time, Brooks stated to Finnegan that "You assaulted me; I am pressing charges."

32.    Immediately afterward, Brooks stated to Wollman that "I will be pressing charges against your officer (Finnegan) for assault."

33.    As the family moved towards the Somers state police barracks, Finnegan uttered to Brooks, "You better get away from me."

34.    Ms. Duryea was walking to the Somers Police Barracks to ask Officer Wollman to use the restroom because Trooper Finnegan had previously denied her requests to do so by saying, "You can wait". This resulted in Ms. Duryea's bowels emptying into her underwear.

35.    Duryea asked Brooks to go to their vehicle to retrieve a new disposable underwear for her.

36.    Prior to going back to the vehicle, Brooks stated to Wollman that Finnegan misrepresented that availability of the Somers Police Barracks. At that same time, Finnegan admitted to Wollman (and others present) that he struck Brooks in the chest with his elbow.

37.     Brooks obtained the disposable underwear for Duryea.

38.     While Duryea used the restroom, Brooks and Harding asked
        Wollman for the parolee travel document signature.

39.     When Wollman looked for the relevant page, he could not find it.
        Brooks had last given the needed page to Finnegan.

40.     Investigator Wollman asked Brooks, "What are you, some kind of
        tough guy standing like that?" Brooks responded," Because my
        mother is in there." (Brooks was standing at parade rest in front of
        the bathroom door that had no lock.)  Wollman again, "Mr.
        Brooks, you need to settle down"

41.     Brooks responded to the officer by saying that the only way he
        would be able to calm down is if he were to use his medication.

42.     Speaking to Harding, Brooks stated he was going back to the
        vehicle to have a smoke.

43.     At this time, Brooks opined, aloud (that the State Police then
        present at the Somers State Police Barracks were) "All fucking
        cunts."

44.     Brooks exited the barracks, returned to the family vehicle, and
        proceeded to assemble a tobacco cigarette.

45.     Harding and Brooks subsequently returned to the family vehicle.
        Harding was upset by Finnegan's treatment of Brooks.

COMPLAINT  -

46.     Harding stated that Brooks should not have indicated to the police that the medication he wanted to use was medical marijuana.

47.     Duryea subsequently returned to the family vehicle.

48.     Finnegan and Wollman walked up to the passenger side of the family vehicle. The passenger side door was open. Wollman asked to see a certificate that the medical marijuana usage was authorized by a doctor.

49.     Brooks responded with an inquiry as to whether Wollman had a warrant to force Brooks to produce said document.

50.     Wollman proceeded to grab Brooks's arm through the passenger side door and push the passenger side door open beyond it's normal limits.

51.     As the action in the immediately previous paragraph was happening, Brooks stated to Wollman "Piss off, freedom of speech."

52.     Wollman also asked on or around the same time whether Brooks had a medical marijuana ID card. Brooks stated that he did, but it was in his wallet.

53.     Wollman assumed that the marijuana card was not for use in New York State. Wollman asked if Brooks understood that marijuana usage and possession was illegal in New York State.

(Subsequently, it has been legalized.)

54.     Brooks, confused by the commotion, responded to Wollman's question by affirming his federal right to freedom of speech while on government property.

55.     Duryea asked Brooks to deescalate.

56.     Wollman asked Brooks if there was marijuana present in the vehicle.

57.     Due to the psychological pressure exerted against Brooks by both Wollman and Finnegan, Brooks responded to Wollman's inquiry with a flippant remark, prompting laughter from Wollman.

58.     Duryea again asked Brooks to deescalate.

59.     Wollman allegedly stated to Brooks to step out of the vehicle. However, no one present in the vehicle heard Wollman state this request aloud.

60.     Wollman then forcefully grabbed Brooks, which alarmed Duryea, Harding, and Brooks. Both Wollman and Finnegan were leaning into the vehicle's interior. Duryea asked, "What are you two doing?" (Asking the Officers what they were doing)

61.     Brooks acceded to exit the vehicle.

62.     However, Wollman and Finnegan pulled Brooks from the vehicle and slammed Brooks onto the pavement. (This is following the

elbow to the chest Brooks received minutes earlier from Finnegan.) The forcefulness of the slam sent Brooks's glasses skittering across the asphalt parking lot.

63.    After slamming Brooks onto the pavement, both Wollman and Finnegan had their knees on Brooks's upper back and abdomen, causing him severe difficulty breathing.

64.    Brooks stated to the officers that he could not breathe.

65.    After this, Wollman got off of Brooks.

66.    Harding went to retrieve Brooks's glasses, but was told by both officers to step away.

67.    Brooks was placed into handcuffs, Brooks asked 3 times, "what am I being charged with?" Brooks was led into the barracks, and was later informed that he was being charged with assaulting police officers. Brooks immediately asked for an attorney and stated nothing else.

68.    Cheyenne & Mrs Duryea went into the barracks.

69.    Officers Finnegan & Wollman led brooks to the back of the barracks into a room with a desk, chair, and a metal connection for handcuffs, removed Brook's left hand from the handcuffs and attached the right arm to the wooden wall with the metal connector. Brooks heard Cheyenne & Mrs. Duryea talking to

16
COMPLAINT  -

Officers in the front entry of the barracks. Wollman stated, "Just trying to understand his paperwork." Cheyenne interjected, "He has, he has. He has PTSD." Mrs Duryea stated, "We have never had a problem." Then Officer Wollman asked, "Does he usually act like that?" Brooks was in the back room alone and hit the wall with his cuffed hand.

70.   Mrs. Duryea stated again, "We have never had a problem with you guys. Ever." Cheyenne, then said, "He has, um, can I say, can I say something?" Officer Wollman interrupted," Is he on, is he on medication?" Mrs. Duryea responded, "Yes." Cheyenne stated, "He has chronic PTSD." Officer Wollman, replied "Okay." Cheyenne interjected, "Chronic." Duryea offered further, "He spent 10 years in prison." Officer Wollman responded, "Okay." Duryea called into the back to Brooks, and asked, " Joseph do you think you could apologize, and we could just go home?" Wollman did not make any comment. A noise came from the back of the barracks. Wollman (alarmed) attempted to go through the door into the back and when he found it was locked he jumped over the approximately four foot high barrier to the front office area. Wollman left going to the back of the barracks.

71.     A civilian entered the barracks and asked if anyone was there to take a report. Cheyenne & Duryea told her that the officers were out back with her son right now. The woman was talking to Brook's family about her missing peacock, and that she needed to report it. (At the same time this discussion was going on in the front of the barracks Wollman was in the rear of the barracks.)

72.     He asked Brooks," What was that?" Brooks responded, "I punched the wall." Then Finnegan asked, "Are you going to hit me to?" While Brooks was answering, simultaneously Brooks was punched on the side of his face by Finnegan and Brooks's head hit the wall as Brooks's response of "no" was uttered.

73.     When Brooks started yelling, "Help! Stop! Help! someone help me!" (The unknown civilian left the barracks.) Brooks remembers Wollman kneeling on his chest before they were punching him in the groin and abdomen and kicking him in the legs. Brooks said, " Help, I can't breathe." Wollman shifted his weight off of Brooks's chest, stating, "wait ." Finnegan then said, "I'll go get the leg irons." Finnegan came back, attached the shackle to Brooks's right leg then holding the other end of the shackles proceeded to pull Brooks's leg toward Finnegan holding the shackle designed

for the left ankle and repeatedly kicked Brooks in the groin, abdomen and leg.

74.    After the assault ended, Investigator Gould came in and asked Brooks "if he needed medical attention or if there was anything he could do for Brooks?"

75.    Brooks responded, "I want to make a report about the assaults I just endured; I want to press charges." Brooks was covered in blood that he showed to the investigator. Brooks also said," I want medical and I would really like a cigarette right about now. Gould, the investigator said, "I'll look into it, I'll see what I can do about that cigarette." and he left.

76.    Brooks was then brought to another office by Finnegan. There were 2 desks, four monitors, an L shaped set of benches, a shallow style closet, and an outside style trash can. Brooks was attached to the benches by his left ankle to the bench leg, and stretched across the other bench with his right arm attached to the wall stretching his entire body across the length of the benches. Then Investigator Gould entered the area, Brooks asked him, " Do you think you could get them to loosen my cuffs, it's cutting off circulation to my ankle and drawing blood on my wrist?" He responded, by saying, Let me go see about that cigarette." and he

left. When Investigator Gould returned he escorted Brooks (cuffed and shackled) to the basement offices. Gould, said, I'm gonna get you a piece of paper and pen to write your statement. Brooks responded, "The only way this is going to work is if you write it because I'm in to much pain too write, my hands hurt." Brooks was unaware of time passage because there were no clocks. Gould retrieved a digital camera and took pictures of Brooks's hands.

77.    Cheyenne and Duryea had returned to the Jeep for Duryea to have a cigarette and review the films on the cellphone. Trooper Finnegan came out and opened the passenger front door where Brooks had been sitting. He started reaching into the floorboard toward the polyester Marlboro lunch bag where Brooks keeps his tobacco and roller. Finnegan, when asked what he was doing, replied, "If you would just give me his marijuana, I wouldn't need to search the vehicle." Duryea asked Cheyenne to get his medical case. Cheyenne retrieved the valtz box from the rear of the jeep as she was sitting in the back seat, as she had been when Brooks was pulled out of the front passenger seat. Finnegan, Duryea, and Cheyenne returned to the barracks.

78.    While Brooks was with Gould, Wollman was asking Duryea for the keys to the Jeep, which she was holding politely

out of his reach and asking for his legal authority to search the vehicle. Wollman replied, "Due to exigent circumstances, I'm allowed to search." Duryea did hand Wollman the keys with the admonition that she was not authorizing the search. Wollman retrieved Duryea's cigarettes and lighter but refused to give her purse to her. A few minutes later Finnegan approached Duryea with a small wooden box from her purse asking what are the pills that are in it? Duryea responded, "That is my potassium." "Oh vitamins?", Finnegan questioned. Duryea replied "Not really, they are my prescription, but the bottle does not fit in my purse." Finnegan advised that it is a crime to have prescription medication in an unlabeled container, and returned to the Jeep. Duryea asked Cheyenne to film the search with a cell phone.

79.   In the video it is visible that Wollman, Finnegan and Gould Are standing behind the Jeep when Gould removed the F. LLIPIETTA percussion cap and ball antique pistol from Duryea's closed blue (ID tagged) rolling travel-case and Gould moved it to Brooks's nylon laptop case.  *(However, in the police reports it is written that officer Gould "observed a brown gun handle sticking out of a computer bag. Secured evidence item #3 and identified it as a loaded/ semi-cocked black powder  F. LLIPIETTA  44 cal.*

*Revolver bearing Serial Number: 681107.")*  Investigator Gould advised Cheyenne to step back because he just recovered a firearm from the vehicle. Gould Then placed the laptop bag on the asphalt surface, picked the black powder gun up and removed it from the case where he had just inserted it, and then walked toward the barracks. Gould asked Duryea, "Do you know what this is? Duryea responded, " No." then said, "Well, yeah I know that is a gun." Gould then asked Cheyenne; she responded, "That is my gun." Duryea then offered, "Oh that is her target pistol that she got from Fingerhut and uses in our backyard for target practice."

80.  The Officers were asking Cheyenne questions, Duryea asked, "Cheyenne please hand my phones back to me." Officer Wollman said, "She can't do that because I'm arresting her and taking them into my custody for investigation." Cheyenne was arrested.

81.  Finnegan, after Cheyenne was arrested, asked Brooks if she was his girlfriend or wife? Brooks told him Cheyenne is his cousin. All 3 Officers Wollman, Finnegan and Gould questioned Brooks after completing the search of the Jeep, questions about the gun, the medical marijuana case, and made threats of destroying Brook's case if he did not provide the code to open it. Gould prepared a fictitious statement that Brooks refused to sign, and Brooks again

22
COMPLAINT  -

asked for a lawyer. The Officers repeatedly tried to question

Brooks even though Brooks had repeatedly requested a lawyer.

82.     Wollman came into the front office and informed Mrs. Duryea that

they would not arrest her or seize her vehicle. Duryea asked if she

could go get her family some food and coffee since they had not

eaten since morning. Duryea went to Dunkin Donuts and got food

and coffee for them all.

83.     Shortly after receiving the food, Brooks again asked to have a

cigarette. Finnegan brought Brooks outside onto the front steps of

the barracks for a cigarette. Finnegan was talking nicely, and asked

Duryea if she had a heart condition (Duryea thought, "Oh yeah the

nitro in my purse"). Finnegan continued talking about how he had

a          4 year old little boy, a 12 year old step daughter who had just been

sexually harassed on the school bus by a boy who pinched her on

the buttocks. He later stated that he had been in the military (Iraq,

Iran, or Afghanistan) I don't remember. (but I remember thinking

that his actions today were not honorable like I believe our soldiers

are) Finnegan stated that had been sober for either 6 or 7 years. We

talked about his dogs and how he would retire soon. Duryea told

him that he, "Should have retired yesterday." Brooks talked about

Duryea's training in California for firefighting, side handle baton,

23
COMPLAINT  -

stun gun and pepper spray that he had attended with her as a child, and sleeping in the office while she dispatched for California Mountain Patrol, also about his mother scoring #1 in a group of 50 that tested to become San Bernardino County Sheriffs.

84.　While back inside the barracks, Brooks heard the officers making arrangements to bring them to court. Two Officers were speaking beyond Brooks's vision, he believes it was Finnegan and Wollman. One Officer asked the other, " So who's good? who can we get? who is in town? The other officer replied "Well I saw Timone in town today, he's in a white bourgeois suit." The officers walked away.

85.　On the way to the court Finnegan was driving, Cheyenne & Brooks were in the rear of the cruiser. Finnegan said," I'm only doing what the judge told me to."

86.　Brooks was assigned William Fleming at the courthouse, Cheyenne was assigned Westchester legal aid, then after Brooks was speaking with Flemming for a few minutes, suddenly Brooks and Cheyenne's lawyers were switched.

87.　Cheyenne and Brooks were brought before Judge Timone for a bail hearing. Cheyenne on CPW - 2ND  LOADED FIREARM in violation 265.03 subdivision 03 of the penal law of the State of

New York. Brooks was charged with 2 counts of ASSAULT – 2ND DEGREE in violation of section 120.05, RESISTING ARREST in violation of section 205.30, DISORDERLY CONDUCT in violation of section 240.20.

88.   Brooks and Cheyenne both asked their lawyer and the judge to secure, "Our phones, police video and recordings" and to speak with internal affairs. They were assured that all of the evidence would be secured. Brooks was remanded to custody while Cheyenne was released in her Aunt Duryea's custody.

89.   Finnegan drove Brooks to the Westchester County Jail. Finnegan said to Brooks, "Nothing personal, I'm just doing my job."

90.   Brooks was booked into the jail where they took all his belongings including the clothes where he had wiped his blood off of himself. Brooks advised the jail that he needed mental health, so he could get his injuries on video, photographed and documented. This was Friday July 26th, 2019.

91.   Monday July 29th, 2019 Brooks was brought to Somers Justice Court where he again asked for Internal Affairs and the phones and other recorded evidence be protected.

92.   Tuesday July 30th, 2019 Brooks was brought to Westchester County Supreme Court from the Jail. A public defender

represented him while the Assistant District Attorney (ADA)

Yvonne Morales enumerated the charges and added false

statements verbally to the court proceeding. Brooks's bail was set

at $10,000.00 cash or bond. Tuesday Mrs. Duryea was told by the

bondsman that he would arrange the bail but they would need

Brooks to return to court on Wednesday.

93.     Wednesday July 31, 2019 The bond was set with the court. The

Bond cost my  mother over $900.00 which I had to repay to her.

94.     Thursday August 1, 2019 Brooks was released from the jail after

approximately 10PM to Mrs. Duryea, they returned to his

stepfather's home in South Salem, New York. Cheyenne assisted

Brooks to take pictures of his fading bruises. The medical records

from the jail classified him as Acute underweight at 121 pounds

and 5'10" tall with a BMI of 17.4.

95.     Monday August 5, 2019 Brooks appeared in Somers Justice court,

on bail. Brooks again asked for any recordings from the barracks, and for

protection of the recordings on our phones. He requested that Internal

Affairs be involved. Judge Timone asked if a warrant had been prepared

for the phones yet.

96.     Tuesday August 6, 2019 Brooks executed a powerb of attorney through Judge Susan Simon of South Salen, NY. Brooks needed to return to New Hampshire to report for a scheduled parole Check in on Wednesday August 7, 2019.

97.     Brooks needed to return to Somers Justice Court on Monday August 19, 2019 for another hearing; where he again requested any recordings from the barracks, and for protection of the recordings on our phones. Brooks requested that Internal Affairs be involved. Judge Timone asked if a warrant had been prepared for the phones yet.

98.     Monday September 16, 2019 Brooks again returned to Somers Justice Court for another hearing where he again requested any recordings from the barracks, and for protection of the recordings on our phones. Brooks requested that Internal Affairs be involved. Judge Timone asked if a warrant had been prepared for the phones yet.

99.     Monday October 21, 2019 Brooks again returned to Somers Justice Court for another hearing where he again requested any recordings from the barracks, and for protection of the recordings on our phones. Brooks requested that Internal Affairs be involved. Judge Timone asked if a warrant had been prepared for the phones yet.

100.    Monday November 25, 2019 Brooks again returned to Somers Justice Court for another hearing where he again requested any

recordings from the barracks, and for protection of the recordings on our phones. Brooks requested that Internal Affairs be involved. Judge Timone asked if a warrant had been prepared for the phones yet.

101.     December 9, 2019, Monday Brooks again returned to Somers Justice Court for another hearing where he again requested any recordings from the barracks, and for protection of the recordings on our phones. Brooks requested that Internal Affairs be involved. Judge Timone asked if a warrant had been prepared for the phones yet.

102.     January 6, 2020, Monday Brooks again returned to Somers Justice Court for another hearing where he again requested any recordings from the barracks, and for protection of the recordings on our phones. Brooks requested that Internal Affairs be involved. Judge Timone asked if a warrant had been prepared for the phones yet.

103.     Monday March 2, 2020 Brooks again returned to Somers Justice Court for another hearing where he again requested any recordings from the barracks, and for protection of the recordings on our phones. Brooks requested that Internal Affairs be involved. Judge Timone asked if a warrant had been prepared for the phones yet.

104.     After March 2020 the courts were closed for Covid precautions.

105.    Then Brooks started receiving emails from the court threatening

arrest for failure to appear. Brooks received notifications on  Feb

24, 2020 , Feb 28, 2020, Mar 1, 2020,  Mon, Aug 17, 2020 ,Aug

21, 2020 ,Aug 23, 2020,  Sep 21, 2020,  Sep 25, 2020, Sep 27,

2020, Oct 16, 2020, Oct 18, 2020, Oct 26, 2020, Oct 30, 2020,

Nov 1, 2020, Nov 9, 2020   Nov 13, 2020, & November 15, 2020,

With the following text "This is an important message on behalf of the New York

State Unified Court System.

Joseph Brooks has a court appearance and must appear at Somers Town

Court (or virtually if authorized by the court) on Monday, DATE INSERTED, 2020 at

6:00 PM .

To avoid the possibility of a warrant being issued for your arrest, you are

required to appear before the court (either in person or virtually if authorized by the

court), at the following location: 335 Route 202, Somers, NY 10589.

If you have an attorney, you should consult with him or her if you have a

question about this   appearance in court.

If you need further assistance, please contact your attorney.  Alternatively,

you may call the court at (914) 277-8225 regarding your case number(s): 19070068. "

106.    September 28, 2020 Brooks and Duryea met with the Westchester

County ADA Cooper Gorrie and other Investigators. Attorney

Mary Pat Long of Westchester Legal Aid Society had promoted the

meeting as an appointment with Internal Affairs, by lying to Brooks

and Duryea, when in fact the meeting was to further her efforts and

COMPLAINT  -

agenda at a plea deal rather than taking action against the officers who fictitiously and maliciously charged Brooks with crimes that he did not commit.

107.     Assistant District Attorney (ADA) Cooper Gorrie found Brooks and Duryea credible, and that facilitated Attorney Long's objective of obtaining an Adjournment in contemplation of dismissal(ACD). Attorney Long was well aware that Brooks was looking for a complete dismissal or acquittal because he committed no crimes on July, 26, 2019 in contrast to the New York State Police who beat him, falsely arrested him, maliciously prosecuted him, and illegally incarcerated him while depriving him of his Constitutional rights.

108.     Brooks was asked to sign documents within the District Attorney's office that he has never been provided a copy of despite assurances by ADA Gorrie and Attorney Long that he would get a copy.

109.     Gould signed an affidavit under oath stating that Brooks "did intentionally, knowingly and unlawfully commit the felony of ASSAULT 2: WITH INTENT TO CAUSE PHYSICAL INJURY TO OFFICER/FIREMAN/EMT. A person is guilty of assault in the second degree when:3. With intent to prevent a peace officer, a police officer, a firefighter, including a firefighter acting as a paramedic or emergency medical technician administering first aid in the course of

30
COMPLAINT  -

performance of duty as such firefighter, an emergency medical service paramedic or emergency medical service technician, or medical or related personnel in a hospital emergency department, a city marshal, a traffic enforcement officer or traffic enforcement agent, from performing a lawful duty. by means including releasing or failing to control an animal under circumstances evincing the actor's intent that the animal obstruct the lawful activity of such peace officer, police officer, firefighter, paramedic, technician, city marshal, traffic enforcement officer or traffic enforcement agent, he or she causes physical injury to such peace officer, police officer, firefighter, paramedic, technician or medical or related personnel in a hospital emergency department, city marshal, traffic enforcement officer or traffic enforcement agent; Assault in the second degree is a class D felony.

TO WIT: On the aforementioned date, time and place being the New York State Police Barracks at SP Somers located al 295 Route 100 in the Town of Somers, County of Westchester, State of New York; Said defendant did knowingly and intentionally engage In a physical altercation with two members of the New York State Police which resulted in both members sustaining physical injuries.

110.   As a result of the charges and his fear of continued retaliation for his speech, Brooks has experienced exacerbated anxiety, depression, and

PTSD.

111.   In addition, the initiation of charges made Brooks fearful to interact with police.

112.   On May 6, 2022, the Court granted a dismissal of the resisting arrest and disorderly conduct criminal charges against Brooks and the assault charges were withdrawn. Sealing the records.

113.   In June of 2022 Brooks, Duryea, and Cheyenne returned to the Somers NY State Police barracks to retrieve their property. Different officers were at the barracks in June of 2022. The phones, medical marijuana case, the antique pistol, tobacco products and other miscellaneous articles were returned, all but the glass pipes, vape equipment, and vape oils which were taken were not returned. Duryea asked about the pipes and was told, "That is all we have maam."

114.   New York State Police has shown deliberate indifference to the constitutional rights of the residents and visitors to its community by failing to train its officers that the pressing of criminal charges against individuals who express their disagreement with officers—even in inarticulate or offensive ways—is conduct that is protected by the First Amendment to the United States Constitution and article I, section 7 of the New York Constitution.

115.   On March 15, 2019, New York State Police Office deputies arrested

another individual for abusive epitaphs and threatening gestures for saying "F**k you" and raising a middle finger to the police.

116. On July 26, 2019, New York State Police Office Trooper Ruse arrested an individual for disorderly conduct when that individual began cursing at Ruse and another individual.

## CAUSES OF ACTION

### COUNT I

### 42 U.S.C. § 1983 – CONSTITUTIONAL TORT - FIRST AMENDMENT RETALIATION DEFENDANTS FINNEGAN & WOLLMAN

117. Brooks incorporates by reference the allegations of the proceeding paragraphs as though set forth at length herein.

118. Publicly criticizing the actions of the government and government officials, however crudely, is conduct protected by the First Amendment to the United States Constitution

119. Defendants' conduct in bringing criminal charges against Brooks for his critical statements chilled Brooks for exercising that right and constituted retaliation and harassment of Brooks for his expression of speech protected by the First Amendment to the United States Constitution.

### COUNT II

### New York CODE § 670 – STATE CONSTITUTIONAL TORT - FIRST AMENDMENT RETALIATION AND DENIAL OF RIGHTS UNDER

**ARTICLE I, SECTION 7 OF THE NEW YORK CONSTITUTION**

**AGAINST DEFENDANTS FINNEGAN & WOLLMAN**

120.   Brooks incorporates by reference the allegations of the proceeding

paragraphs as though set forth at length herein.

121.   Publicly criticizing the actions of the government and government

officials, however crudely, is conduct protected by the First Amendment

to the United States Constitution and Article I, Section 7 of the New York

Constitution.

122.   Defendants' conduct in bringing criminal charges against Brooks for his

critical statements chilled Brooks for exercising that right and constituted

retaliation and harassment of Brooks for his expression of speech

protected by the First Amendment to the United States Constitution and

violated Brooks's right to free speech protected by Article I, Section 7 of

the New York Constitution.

**COUNT III**

**42 U.S.C. § 1983 – CONSTITUTIONAL TORT - FALSE ARREST &**

**STATE TORT – FALSE ARREST– DEFENDANTS FINNEGAN &**

**WOLLMAN**

123.   Brooks incorporates by reference the allegations of the proceeding

paragraphs as though set forth at length herein.

124.    Brooks has a clearly established right under the Fourth and Fourteenth Amendments to the United States Constitution, Article I, Section 8 of the New York Constitution, and New York state law to be free from unreasonable seizure of his person, and property, a right Defendants Finnegan, Wollman, and Gould violated when, claiming to act under proper legal authority, they worked to file criminal charges against Brooks without any probable cause or reasonable basis for believing that Brooks committed assault or any other crime in the state of New York.

### COUNT IV

### New York CODE § 670 – STATE CONSTITUTIONAL TORT - FALSE ARREST – DEFENDANTS FINNEGAN & WOLLMAN

125.    Brooks incorporates by reference the allegations of the proceeding paragraphs as though set forth at length herein.

126.    Brooks has a clearly established right under the Fourth and Fourteenth Amendments to the United States Constitution, Article I, Section 8 of the New York Constitution, and New York state law to be free from unreasonable seizure of his person, a right Defendants Finnegan, Wollman, and Gould violated when, claiming to act under proper legal authority, they worked to file criminal charges against Brooks without any probable cause or reasonable basis for believing that Brooks committed assault or any other crime in the state of New York.

COMPLAINT  -

## COUNT V

## MONELL CLAIM – FAILURE TO TRAIN – DEFENDANT New York State Police

127.  Brooks incorporates by reference the allegations of the proceeding paragraphs as though set forth at length herein.

128.  Defendant New York State Police was deliberately indifferent when it failed to properly train Defendant Officers that Brooks has a First Amendment and NY State Constitution Article I, Section 7 right to publicly criticize police officers and their official actions.

129.  Without the New York State Police deliberate indifference for failing to have a proper policy and to properly train Defendant officers, Brooks would not have suffered the retaliatory actions and arrest at the hands of State of New York employees and would not have been injured as a result.

## COUNT VI

Malicious Prosecution Under
42 U.S.C. § 1983 Against Individual
Defendants

130.  The above paragraphs are here incorporated by reference as though fully set forth.

131.  By their conduct, as described herein, defendants are liable to plaintiff for the violation of his constitutional right to be free from malicious prosecution under the Fourth and Fourteenth Amendments to the United

States Constitution.

## COUNT VII

Failure to Intervene Under

42 U.S.C. § 1983 Against Individual Defendants

132. The above paragraphs are here incorporated by reference as though fully set forth.

133. Those Defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

134. Accordingly, the Defendants who failed to intervene violated the Fourth and Fourteenth Amendments.

135. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages herein before alleged.

## COUNT VIII

Denial of Right to Fair Trial Under

42 U.S.C. § 1983 Against Individual Defendants

136. The above paragraphs are here incorporated by reference as though fully set forth.

137. The individual Defendants created false evidence against Plaintiff, to wit, sworn documents and testimony alleging that Mr. Brooks assaulted officers.

138. The individual Defendants forwarded false evidence to prosecutors in the Westchester County District Attorney's office.

139.   In creating false evidence against Plaintiff, and in forwarding false information to prosecutors, the individual Defendants violated Plaintiff's right to a fair trial under the Due Process Clause of the Fourth and Fourteenth Amendments of the United States Constitution.

140.    As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Brooks respectfully requests the following:

a)   A declaratory judgment that Defendants' conduct violated Brooks's rights under the First, Fourth, and Fourteenth Amendment of the U.S. Constitution and Article I, Section 7 of the New York Constitution; and NY Code § 485.05.

b)   An award of compensatory damages against all Defendants, joint and severally, in an amount to be determined at trial;

c)   An award of punitive damages against all Defendants;

d)   A permanent injunction, enjoining Defendants, their employees, agents, assigns and all those acting in concert with them, from criminally charging individuals for constitutionally protected speech that criticizes the Defendants and the Defendants actions in

conducting their duties for the state, and requiring training of New York State Police law enforcement officers regarding free speech rights;

e) An award for costs, expenses and attorney's fees pursuant to 42 U.S.C. § 1988; and

f) Enter such other relief as this Honorable Court may deem just and deserving.

## JURY DEMAND

A trial by jury is hereby demanded.

Saturday, July 23, 2022.

Respectfully submitted,
/s/Joseph A. Brooks, *pro se*
1137 Meaderboro Road
Farmington, NH 03835

COMPLAINT  -

41
COMPLAINT  -

42
COMPLAINT  -